INTERNATIONAL AND GREAT NORTHERN RAILROAD COMPANY ET AL. V. AUGUST STARTZ

Decided February 21, 1906.

**1.—Charge—Assuming Facts.**

Charge on the measure of damages held to involve error in its assumption that cattle transported by rail arrived at market in a damaged condition.

**2.—Connecting Lines—Charge.**

Charge on the duty of connecting lines of railway, under contracts limiting the liability of each to its own line, criticised for requiring the defendants to use due care to transport a shipment of cattle to their destination.

**3.—Evidence—Entries in Books—Account of Cattle Sales.**

Entries made in the books of a live stock commission house by its employes, showing the receipt, number, weight and price realized on a shipment of cattle, were admissible in evidence in a suit by the shipper against the carriers, as verbal acts cotemporaneous with the principal fact, forming links in the chain of events and constituting a part of the res gestae, or as entries made at the time and in the ordinary course of business by a person whose duty it was to make them, though entered on report from others, and not by the persons who weighed or sold the cattle, and identified by witnesses unable to remember the facts. The authorities on admissibility of such testimony reviewed.

Appeal from the District Court of Comal County. Tried below before Hon. L. W. Moore.

*S. R. Fisher* and *J. H. Tallichet* (*N. A. Stedman,* of counsel), for appellant.—The court erred in the admission of the testimony of the witnesses Overstreet and Stewart that the four copies of account sales attached to their depositions and offered in evidence showed the correct weights of said cattle and the amount received for each lot of same at the National Stock Yards, and in admitting in evidence said account sales purporting to show said weights and prices, because it appeared from the cross-examination of each of said witnesses, who were the only witnesses who attempted to testify as to said matters, that neither of them weighed said cattle or saw them weighed, or had actual personal

knowledge that the weights, or the prices calculated from the weights were correct. The witness, Overstreet, sold the cattle at certain prices per hundred weight, but as he did not weigh the cattle and had no recollection of having seen·them weighed he could not testify that certain weights or certain prices, calculated from the weights, shown by book entries or other memoranda not made by him, are correct. The witness, Stewart, was a bookkeeper of the commission company, who did not even pretend that he weighed the cattle, saw them weighed or was even present when they were weighed or sold; his records are all from information furnished him by others, and his testimony as to the weights and prices shown by the account sales is the worst kind of hearsay. The account sales, not being shown to be correct by proper or competent evidence, were also inadmissible. International & G. N. R. R. Co. v. Startz, 97 Texas, 167; Texas & P. Ry. Co. v. W. Scott & Co., 86 S. W. Rep., 1065; Texas & P. Ry. Co. v. Leggett, 86 S. W. Rep., 1066.

The court erred in the third paragraph of the charge to the jury because the same, in advising the jury that it was the duty of defendants to safely convey plaintiff's cattle to their destination, imposes upon defendants a burden greater than is warranted by law, defendants, if not guilty of negligence, not being liable for any want of safety in the transportation of said cattle, and in no event being bound to transport same to their destination, but only being bound to transport said cattle to the end of the line of railroad of each defendant on the route over which said cattle were shipped.

The court erred in the ninth paragraph of the charge because the same assumes as a fact and advises the jury that when plaintiff's cattle arrived at their destination they were in a damaged condition and that in the course of their transportation by defendants they did not receive proper handling and care, although the evidence on said issues was conflicting, and there was much evidence tending to show that the cattle were transported with all due care and diligence. Galveston, H. & S. A. Ry. Co. v. Davidson, 61 Texas, 205; Houston & T. C. Ry. Co. v. Nixon, 52 Texas, 28; St. Louis Ry. Co. v. Smith, 63 S. W. Rep., 1064; Missouri, K. & T. Ry. Co. v. Williams, 40 S. W. Rep., 161; Houston City St. Ry. Co. v. Artusey, 31 S. W. Rep., 319; Gulf, C. & S. F. Ry. Co. v. White, 32 S. W. Rep., 322; Missouri Pac. Ry. Co. v. Christman, 65 Texas, 369; Mayo v. Tudor, 74 Texas, 471; Texas & P. Ry. Co. v. Murphy, 46 Texas, 368; Heldt v. Webster, 60 Texas, 207; Austin v. Talk, 26 Texas, 130; Andrews v. Marshall, 26 Texas, 215.

*J. D. Guinn,* for appellee.—We think that the testimony of these two witnesses shows the facts conclusively, if they do not, then we have no way to establish our rights, for the weigher is dead, the original book entries were consulted and books shown to be correctly kept. The case was reversed the first time because we did not have the keeper of the books to verify the accounts. Now we have complied with that matter and the proposition is to reverse because we have done so. International & G. N. R. R. v. Startz, 77 S. W. Rep., 1.

FISHER, CHIEF JUSTICE.—This is a suit by appellee Startz against

the International & Great Northern Railroad Company, the St. Louis, Iron Mountain & Southern Railway Company, and the Texas & Pacific Railway Company, to recover damages in the sum of $4,000, resulting to a shipment of beef cattle from New Braunfels, Texas, to East St. Louis, Ill.

There was a verdict and judgment in favor of the appellee against the International & Great Northern Railroad Company for $1,500, and the St. Louis, Iron Mountain & Southern Railway Company for $1,000, and in favor of the Texas & Pacific Railway Company.

There is no cross assignment of error complaining of the judgment in favor of the latter road. Therefore, as to it, the judgment of the trial court will be affirmed. The judgment as against the two first-named roads will be reversed for the error pointed out in appellant's eighth assignment of error, which complains of the ninth subdivision of the charge of the trial court, which is as follows:

"In all these matters of fact you are the sole judges of the weight to be given to the testimony of the various witnesses. But in considering these matters as elements of injury, you are instructed that the measure of damages is the said difference, if any, in the market value of the stock at their destination in the condition in which they were when delivered, and the market value in the condition they should have been under proper handling and care under the contracts of the parties they should have been delivered."

This charge is objected to on the ground, practically, that it is on the weight of evidence, in that it assumes as a fact that when plaintiff's cattle arrived at their destination, they were in a damaged condition, and that in the course of their transportation by the defendants, they did not receive proper handling and care. There is a conflict in the evidence upon the question as to whether the cattle were properly handled, and received proper care during their transportation. This charge, like all others, must be construed and considered in connection with the other parts of the charge submitted; but when found erroneous, and not corrected by some other instruction, it must be held reversible error to give it, unless it clearly appears that it did not or could not have had any harmful effect. There was a sharp conflict in the testimony as to the manner in which the cattle in controversy were handled and cared for, and much of the plaintiff's case is predicated upon what he claims to be rough handling received during their transportation, all of which is practically denied and disputed by evidence coming from the railway companies.

The charge in using the expression, "all these matters of fact," evidently relates to some statement previously made by the trial court concerning the facts or the items of damages, which the jury might consider; but the instruction is in a separate and independent paragraph, and was calculated to impress the jury with the view that the matters referred to constituted facts, rather than mere evidence; and also that the cattle were in a damaged condition, and would have been otherwise, if properly handled and cared for. Of course, we know that it was not the intention of the trial court to so, in effect, instruct the jury, but the language used is of a nature calculated to impress the jury with the idea that the cattle were damaged and were not properly handled.

There are some objections urged to the charge of the court, based on the ground that these are instructions to the effect that the duty rested upon the railway company to exercise ordinary care to transport the cattle to their destination. The charge of the court does, in a general way, instruct the jury that the railroads would only be liable to the end of the line of each road. But, in view of another trial, we suggest that the court instruct the jury that as to transportation from St. Louis, the end of the line of the Iron Mountain road, the latter would not be liable for any damages that might have occurred between that point and East St. Louis, after the cattle had gone out of the possession of the Iron Mountain road. Of course, it is true a carrier may contract for liability beyond its line, but we do not think that any such state of facts is shown in this case that would make either road responsible for damages that might have resulted to the cattle after the same left their possession.

Appellant's first assignment of error complains of the admission of the evidence of the witnesses Overstreet and Stewart, and the exhibits which accompanied their testimony. These witnesses both reside in East St. Louis, Illinois, and their evidence was taken by deposition, and the exhibits A, B, C and D attached thereto. The objections urged, which were overruled, are to the effect that neither of the witnesses weighed the cattle, or had any personal knowledge about the matter; and the account of sales was objected to on the ground that the same was not verified, in that neither of the witnesses testified from their own knowledge that the various items therein set out were correct. This evidence was offered for the purpose of showing the weight of the cattle at the time that they arrived at East St. Louis, the weight at the time of sales and the amount for which they sold. The following is the evidence:

"E. E. Overstreet, a witness for plaintiff testified by deposition: 'My name is E. E. Overstreet; my age 35 years; residence St. Louis, Mo.; place of business National Stock Yards, St. Clair County, Illinois. My business during the month of May, 1900, was that of cattle salesman for the Chicago Live Stock Com. Co. I had occasion to handle the consignment of cattle mentioned. I sold them as a salesman for the Chicago Live Stock Com. Co. The consignment reached this market in car 2835, S. W. S., containing 26 cattle; car 5056, B. S. C., containing 26 cattle; car 5443, N. E., containing 26 cattle; car 5022, H. S. C., containing 24 cattle; car 1988, C. C. C. C., containing 29 cattle; car 3899, S. W. S., containing 20 cattle; car 1398, S. W. S., containing 29 cattle; car 3818, H. S. C., containing 29 cattle; car 1801, C. C. C. C., containing 32 cattle; car 2630, H. S. C., containing 31 cattle; car 12131, M. S. C., containing 31 cattle; car 1877, C. C. C. C., containing 32 cattle; car 1815, C. C. C. C., containing 32 cattle; car 2011, C. C. C. C., containing 25 cattle and car 2197, C. C. C. C., containing 26 cattle. They arrived at the National Stock Yards, Ill., at 3:15 a. m. on May 22, 1900. I know the classes of the cattle, their weights and prices which they brought, which were shown on copies of accounts of sales hereto attached, marked "Exhibit A," "Exhibit B," "Exhibit C" and "Exhibit D" for identification. An account of sales was rendered on day of sale, true copies of which have been hereto

attached marked Exhibit A, Exhibit B, Exhibit C and Exhibit D for identification, I have attached hereto, marked Exhibit E, for identification, a Stock Yard Company's unloading certificate, showing time of arrival, name of consignor, consignee, car numbers and number of head of cattle contained therein. These cattle were weighed. 26 steers sold at $3.60 per cwt.; 1 bull sold at $3.30 per cwt.; 24 steers and stags sold at $3.60 per cwt.; 13 steers sold at $4.55 per cwt.; 1 bull sold at $3.50 per cwt.; 10 steers sold at $3.40 per cwt.; 116 steers sold at $3.75 per cwt.; 31 steers sold at $3.60 per cwt.; 124 steers sold at $3.60 per cwt.; 2 steers sold at $3.60 per cwt.; 1 big jaw was not weighed, but sold by the head for $15; 78 steers sold at $4.00 per cwt. They were all sold on May 22, 1900. My experience in handling cattle has been almost entirely in the stock yards, and has been such experience as is general among cattle salesman. I have had every opportunity to observe the effect of rough handling, as cattle that have not been properly handled invariably reach the market showing bruises and said bruises reduce their selling value. Cattle that are kept in cars, or, in fact, anywhere for a great length of time without food, water or rest, will shrink materially in weights, and that shrinkage will also lessen the condition of flesh shown by the cattle and affect their appearance in an adverse manner. I do not remember whether these cattle had any bruises or were in unusually bad condition. Bruises and shrinkage always affects the market value of cattle. The cattle reached this market on May 22, 1900, which was Tuesday, and report shows the market on this class of cattle was 10 or 15 cents per cwt. lower than on Monday, the day before. Usually Saturday is considered a poor market day, but when receipts are on an average there is no difference in other days.

"On cross-examination: At this late date, I do not distinctly remember the shipment inquired about. My testimony is from memoranda made by me at the time the cattle in question were sold, and from a letter written by me to Mr. Startz on the day the cattle were sold, and from records contained in the books of the Chicago Live Stock Com. Co., without which I probably could not tell much about the cattle in question. It is a fact that I did not make the memoranda from which I am testifying. I made the memoranda on the scale ticket, showing the price at which the cattle were sold, and also commented on the condition of the cattle and on the condition of the market in letter written to Mr. Startz on the day of sale. The only record I have concerning the condition of the cattle is copy of letter written by me to Mr. Startz concerning them on the day of sale. I did not weigh the cattle and do not remember seeing them weighed. The copies of sales hereto attached marked Exhibit "A," "B," "C" and "D" were made by W. W. Steward, from the salesbook of the Chicago Live Stock Com. Co. The unloading certificate hereto attached, marked Exhibit E was made by an employe of the Stock Yard Company, from original entries in the Stock Yard Company's register. I do not remember the condition of the cattle. I have testified from entries in the salesbook of the Chicago Live Stock Com. Co., which were kept by W. W. Stewart, he making correct entries therein of the weights, prices, number of head, date of sale, name of consignor, name of purchaser, different items of expense deducted from gross amount realized from the

sale of the cattle, net proceeds and disposition made of same, all made at the time of weighing and selling cattle."

"W. W. Stewart, a witness for plaintiff, testified by deposition as follows: My name is W. W. Stewart; my age 33 years; residence East St. Louis, Ill.; place of business National Stock Yards, Ill. My business during the month of May, 1900, was that of bookkeeper of the Chicago Live Stock Com. Co. I had been so engaged at that time about 16 years. I had nothing to do with the weighing or handling of the cattle, but made all entries of sales, payment of freight, yard charges, etc., and rendered accounts of sale for the cattle in my capacity of bookkeeper of the Chicago Live Stock Com. Co. The car numbers in which these cattle arrived and the number of head contained in each car as shown by Stock Yard Company's unloading certificate hereto attached marked Exhibit "E." The class and weight of the cattle was as shown on copy on account sales hereto attached, marked Exhibit "A," "B," "C" and "D," which is a correct copy of the sale tickets of the weights rendered by the Stock Yard Company. The correct prices at which the cattle were sold are also shown on said copies of accounts of sales, they being the prices obtained by our salesman Mr. R. E. Overstreet, and reported to me and collected by me from the purchasers. I did render an account of sales, and have attached hereto copies of same, marked Exhibits "A," "B," "C" and "D," marked across the face with my signature. Stock Yard Company's unloading certificate has also been attached marked Exhibit "E," showing car numbers, number of head of cattle in each car, certified to by the unloading superintendent of the Stock Yard Company. The copies of accounts of sales hereto attached, marked Exhibits "A," "B," "C" and "D" give the correct weight and prices of the same and the day of sale of same. I did not see the cattle and know nothing about their condition. I had nothing to do with selling the stock, did not keep advised of market conditions, my business being to keep a record of sales, render accounts of same, and keep a general set of books for the Chicago Live Stock Commission Company and did not keep in touch with the condition of the market, leaving that entirely to our salesman.

"Cross examination: I have no personal recollection whatever concerning the shipment of cattle inquired about. No, it is not a fact that my testimony is entirely from records or memoranda; we had a correspondence with plaintiff, and at the time sent him a correct statement showing account of the sale. I take my answers from the original entries made by me of the tickets of the weighmaster into the books of the Chicago Live Stock Commission Company at the time, and from this, settlement is made and is relied on by all parties. I did not weigh said cattle, nor did I see them weighed. The weigher is dead, but they are the weights he called out at the time, and I entered them in the books, as stated at the time. The account of sales, as shown in exhibits "A," "B," "C" and "D," being copy of the same I rendered the plaintiff at once, same were made from the books of the Chicago Live Stock Commission Company. Exhibit "E" is made by the Yard Company superintendent, through his representative, same being taken from their books of record, showing the time of arrival and date, car number and number of head in each car. I have no record of the con-

dition of said cattle, and remember nothing about the matter. I obtained the information about which I have answered in direct interrogatories, as stated, from the books of the Chicago Live Stock Company. They were taken from their sales book. They were kept by myself, and were and are kept correctly, entries of the facts being made at the time of selling and weighing."

Plaintiff read in evidence the account of sales referred to by the witnesses Overstreet and Stewart as follows:

### Exhibit "A."

"Chicago Live Stock Commission Company.

National Stock Yards, Ill., May 22, 1900.

Sold for account of Startz, Pfeuffer & Co.

| Purchaser. | Weight. | Price. | Amount. |
|---|---|---|---|
| N. M. & C., 78 steers | 61750 | $4 | $2,470 |
| Total | | | $2,470 |

### Exhibit "B."

"Chicago Live Stock Commission Company.

National Stock Yards, Ill., May 22, 1900.

Sold for account of A. G. Startz & Son.

| Purchaser. | Weight. | Price. | Amount. |
|---|---|---|---|
| Swift & Co., 26 steers | 22010 | $3.60 | $792.36 |
| T. White, 1 bull | 940 | 3.30 | 31.02 |
| Swift & Co., 24 steers and stags | 21450 | 3.50 | 750.75 |
| Total | | | $1574.13 |

### Exhibit "C."

"Chicago Live Stock Commission Company.

National Stock Yards, Ill., May 22, 1900.

Sold for account of Startz & Pfeuffer.

| Purchaser. | | Weight. | Price. | Amount. |
|---|---|---|---|---|
| N. M. & Co., | 116 steers | 78800 | $3.75 | $2955.00 |
| Swift & Co., | 10 steers | 6570 | 3.40 | 223.38 |
| St. L. D. B. Co., | 13 steers | 12720 | 4.55 | 578.76 |
| St. L. D. B. Co., | 1 bull | 1170 | 3.50 | 40.95 |
| | 140 | | | $3798.09 |

### Exhibit "D."

"Chicago Live Stock Commission Company.

National Stock Yards, Ill., May 22, 1900.

Sold for account of A. G. Startz.

| Purchaser. | | Weight. | Price. | Amount. |
|---|---|---|---|---|
| Swift & Co., | 31 steers | 22800 | $3.60 | $ 820.80 |
| Swift & Co., | 124 steers | 87210 | 3.60 | 3139.56 |
| Swift & Co., | 2 steers | 1600 | 3.60 | 57.60 |
| B. P. Co., | 1 big jaw | | | 15.00 |
| | 158 Total | | | $4032.96" |

The admissibility of this evidence does not rest upon the "shop-book rule," which relates only to the books and entries of parties to the controversy, but depends upon those principles of law that admit entries made by third parties *who are not connected with the controversy.* The rule is thus stated: 1. But written entries by persons deceased may, under some circumstances, be shown in evidence against third persons. Thus, where a person has peculiar means of knowing a fact, and makes a written memorandum thereof against his interest at the time, such entry is evidence of the fact as against third persons after the death of the person making it. 2. Again, entries by third persons made contemporaneously with the principal fact, forming links in the chain of events, and constituting a part of the *res gestae,* are admissible. It is on this ground that the latter class of entries *is* admitted; and in such case, it is immaterial whether the entries were for or against the interest of the person making them. 3. Another class of entries made by third persons, which may be received in evidence, is recognized by some authorities, though by others not distinguished from the preceding, and consist of entries made at the time and in the ordinary course of business by a person whose duty it is to make them. 9 Am. and Eng. Ency. Law (2d ed.), 938.

Many cases in the early history of the rule, in enforcing it, predicate it upon the fact that the party making the entry must be dead; but the more recent cases, and among the best considered, not only to some extent qualify the rule, but, in effect, hold that the entries are admissible in connection with the evidence of the party who made them. Some are to the effect that if the party making the entry is beyond the jurisdiction of the court, that is equivalent to death, and is sufficient predicate as a basis for the evidence; others, without qualification, announce that the admissibility of the entries does not depend upon the death or absence of the party making them, but such entries may be introduced in connection with the evidence showing that the entries were properly made, and the books correctly kept.

Mr. Greenleaf in his work on · Evidence, 1st volume, section 120, says: "But it is conceived that the fact of his death (meaning the party who made the entry) is not material to the admissibility of this kind of evidence. There are two classes of admissible entries, between which there is a clear distinction in regard to the principle on which they are received in evidence. The one class consists of entries made against the interest of the party making them, and these derive their admissibility from this circumstance alone; it is, therefore, not material when they were made. The testimony of the party who made them would be the best evidence of the fact, but if he is dead, the entry of the fact made by him in the ordinary course of his business, and against his interest, is received as secondary evidence in a controversy between third persons. The other class of entries consists of those that constitute parts of a chain or combination of transactions between the parties, and proof of one raises the presumption that another has taken place. Here the value of the entry as evidence lies in this, that it was contemporaneous with the principal fact done, forming a link in the chain of events and being a part of the *res gestae.* It is not merely the declaration of the party, but it is a verbal contemporaneous act, belonging, not necessarily, indeed, but ordinarily and naturally to the principal thing.

It is on this ground that the latter class of entries is admitted; and therefore, it can make no difference as to their admissibility whether the party who made them is living or dead, nor whether he was or was not interested in making them, his interest going only to affect the credibility or weight of the evidence when received."

In the case of Chicago Railway Co. v. Ingersoll, 65 Ill., 399, grain was received from the carrier and put into an elevator. Weighing it was a necessary part and in the usual course of the business. Under these circumstances, evidence was offered of an entry made in the books belonging to Munger, Wheeler & Co., the parties to whom the grain was consigned, and who were not parties to the suit, by Clark, the foreman of the receiving and weighing department. It was not pretended that Clark was dead, and the offer of the evidence was based upon showing it to have been in his handwriting, and made in the course of the performance of his ordinary duties. The evidence was held admissible.

In the case of Schaefer v. Georgia Railroad Co., 66 Ga., 40, in a suit against the latter for the loss of goods shipped over its line, it was held over objection that it was proper for the defendant to prove by the agent of another line that the books of his company which contained certain entries relating to the shipment, were properly kept in the usual course of business, and which entries tended to show that the consignment in question had been delivered to a certain steamer to be transported to Baltimore. It was contended that the evidence was hearsay. The witness had no independent recollection of the transaction, but his recollection was refreshed by the entries contained in the books, and he stated that they were correctly kept. There was attached to the evidence of the witness exhibits, as in this case, which were shown to be correct copies of the entries made. These exhibits, in effect, stated what disposition was made of the cotton. Judge Lumpkin, in discussing the admissibility of similar testimony, says: "Shall this proof be received, or shall the plaintiffs be compelled to go behind the books thus verified by the clerks who kept them, and resort to each of the subagents who participated in the transaction and sale of this produce. Are not the entries thus made in the usual course of business of this extensive trading establishment, and as a part of the proper employment of the witnesses who prove them, not only the best, but the only reliable evidence which it is practicable to procure. We have no hesitation in holding that propriety, justice and convenience require it to be admitted. The weighers, wharfingers and numerous subordinates who handle this cotton keep no books. It is not reasonable to suppose that they can remember the multitude of transactions thus occurring every day. After a lapse of a very brief period, the clerks themselves could only call to mind what had been done by referring to their entries and memoranda. The actual salesmen in none of these great wholesale stores keep the books. They report to the clerks who stand at the different desks and they make entries, and yet these books are always received to prove the sale and delivery of goods; any other rule would involve enormous expense, as well as inconvenience, and would in the end be productive of no practical benefit." The court then proceeds to say: "How strikingly applicable are these suggestions and reasons to the case at bar. Here, a corporation engaged as a common carrier, shipping

millions in value of produce yearly, if it could not be allowed to show by the verified and uncontradicted records of other connecting lines the disposition and delivery of produce or other articles entrusted to its care, records made, too, that go to charge the companies whose agents make them, then the inconvenience, confusion and responsibility resulting would be incalculable."

To the same effect is Shove v. Wiley, 18 Pick., 559; Donovan v. Boston & Maine Ry., 158 Mass., 452; Owens v. State, 10 Atl. Rep., 210; Adams v. Coulliard, 102 Mass., 173; Culver v. Marks, 122 Ind., 564; Meyers v. Brown, 130 Mich., 450; Town of Bridgewater v. Town of Roxbury, 54 Conn., 215, and Lassone v. Boston & L. Ry. Co., 17 Law Rep. Ann., 525, where the principle is generally discussed. In these two last cases, however, the party that made the entry was dead, but the general principles with reference to the admissibility of such evidence is fully discussed, especially in the last case noticed.

In the case of Continental Bank v. First Natl. Bank, 68 S. W. Rep., 499, it is stated: "It was said it was error to introduce the books of the bank in evidence. They were produced and identified by the cashier. It is said that defendant should have gone further and shown by the party who made the entries that they were correct. The books were introduced to show the state of account between the National Bank and Duncan, Gaines & Morrow, the object being to show by the course of dealing between the bank and these parties, that the bank was treating and dealing with them as solvent reliable customers. It has been held that where it becomes material, either for or against a corporation, and as against a stranger, or as between two strangers, to prove what was done by the bank, its books and records are admissible in evidence, and they are the best evidence. 6 Thompson Corp., sec. 77, 34." A similar ruling was made in Anchor Milling Co. v. Walsh, 18 S. W. Rep., 905.

In discussing the fact as to the admissibility of entries, where the data is furnished to the bookkeeper by some one else, Greenleaf in his 16th edition, page 206, states this to be the rule: "The difficult situation arises in the application of this part of the principle, where two persons have co-operated in the entry, one having personal knowledge and reporting it to the other, and the other writing down the transaction thus reported; the typical case being that of a salesman and entry clerk and bookkeeper, and that of a workman and foreman recording the work reported. Where both persons are brought to the stand, no question of hearsay exception arises, and it will be seen later that upon the principle of using a past recollection, the combined testimony of the two should suffice to admit the entry; but when one of them, usually the salesman, workman or other person having the personal knowledge, does not appear as a witness, the entry can be received, if at all, only under the present exception. That it should be so receivable seems proper on principle, as well as for reasons of practical convenience, for, apart from the English doctrine admitting oral reports, if the salesman has made a regular report in the course of business which has not taken written shape, it seems not to be essential whether it is he or another who gives it that written shape; and, accordingly, an entry verified by

the person making it of a regular oral report by a person not now available, would be admissible."

This rule is applicable to that branch of the evidence that relates to the entry made upon the report furnished by the employe of the Stock Company who weighed the cattle, and who the witness Stewart testifies is dead.

This court in the case of Rogers v. O'Barr & Dinwiddie, 10 Texas Ct. Rep., 523, held that it is no objection to the admissibility of the entries that they were taken from memoranda furnished by the salesman or clerk who actually sold or delivered the goods, citing 9 Am. and Eng. Ency. Law (2d ed.), p. 925.

It appears from the evidence of the witness Stewart that the exhibits A, B, C and D are correct copies of entries made in the books of the Chicago Live Stock Commission Company; that he was the bookkeeper and the books were correctly kept. The entries consist of data and information furnished him by the original weigher of the cattle, whom he testifies is dead, and by the witness Overstreet, the party that sold the cattle, and furnished him the memoranda with reference to weights, prices and amounts. Stewart testified that the weights transcribed in the books were those called out to him at the time by the weigher; and it is fair to assume from all of the evidence upon this subject that the weights and amounts so furnished to Stewart by Overstreet and the weigher were properly entered in the books in the performance of his duties, and in the ordinary course of business of the Live Stock Company. And such entries should be considered as against the interest of the company, because same show that they received the cattle for the purpose of being sold; therefore, they would be charged with the exercise of ordinary care in the performance of that duty, and the entries made in their books could be taken as evidence against them on the question as to the number, classes and weights of the cattle. The original books being beyond the jurisdiction of the courts of this State, were not required to be produced; and if they were admissible, copies of the entries taken from them, properly proven, would be admissible here. (Missouri Pac. Ry. Co. v. Gernan, 84 Texas, 141.)

The witnesses testified generally as to the correctness of the books kept by Stewart and of the entries in question; and they substantially admit that their testimony is predicated upon the entries made, and that, independent of such entries, they have no distinct recollection of the facts. We assume that it can not be fairly denied but that the entries were practically contemporaneous with the main transaction, or so near thereto in point of time that they may or should be considered as a part of the *res gestae.* They were entered by Stewart in the performance of his duties; and while it is true their evidence could be given little weight without aid from the entries, still, when considered in connection therewith, their recollection as to the facts might be considered refreshed; or, even if they had no independent recollection, if the entries were properly made and were correctly reduced to writing, their evidence, in connection with the entries, would be admissible. This is illustrated by the cases of Clark v. Vorce, 15 Wend., 193; Solomon Railway Co. v. Jones, 34 Kan., 443; Shear v. Van Dyke, 10 Hun,

528, where witnesses were called to prove facts of which they had no independent recollection, of which facts they had made minutes at the time of their occurrence, the correctness of which they testified to, and which upon examination furnished them with no independent recollection; but, nevertheless, it was held that their testimony, in connection with the memoranda, was admissible. It is also held that the memoranda used to refresh recollection, or used in connection therewith, may be a copy of the original. (Finch v. Barclay, 87 Ga., 393; Houston & T. C R. R. Co. v. Burke, 55 Texas, 342.)

There is no objection to the use of the entries by the witness Overstreet, for the purpose of refreshing his recollection. It is true, the entries were not made by him, but he testifies as to their correctness, and he furnished much of the data upon which they were based. The correctness of the entries furnishes the basis for his testimony, and which served to refresh his recollection as to the facts.

In the case of International & Great Northern R. R. Co. v. Blanton, 63 Texas, 111, where objection was made to the evidence of witnesses, and an exhibit offered in connection therewith, the court, in speaking of the weights of certain cotton, said: "Certainly they were competent witnesses to prove these facts, but as no man could possibly retain in his memory all of the infinite details of a business like this, the firm require all these minutiae to be reduced to writing by a yard clerk, in this case the witness Ziegler, and returned to the office, where they are copied into a book and thus preserved in a permanent form. A copy from this books does not, of itself, prove the facts recorded there, but it enables the witness who has transacted the business to recall all the details of the transaction; and it is not necessary that the witness should himself have made the entries in the book, if he knows from the general course of the business that the books are correctly kept. It does not seem necessary, says Greenleaf, that the writing should have been made by the witness himself, nor that it should be an original writing, provided, after inspecting it, he can speak to the facts from his own recollection. In all cases where accounts are multitudinous the rule as to personal knowledge is relaxed. He, the witness, must be permitted to put the items into an account and to refresh his recollection by means of other accounts and papers, as to the items. In a long account of sales, a party rarely recollects all the items, but he can be perfectly certain from his mode of business, on finding the entries in his books, that the charges were correctly made."

While we are of opinion that the entries themselves were admissible as original evidence, still, if the entries were properly made in the course of the official duty of the bookkeeper, they could also serve the purpose of refreshing recollection; and if the entries could be considered as necessary in explanation of the witness's evidence, there would be no error in permitting it to go in evidence along with the testimony of both witnesses.

There are some cases to the effect that a written instrument merely used as memoranda for the purpose of refreshing recollection could not, after it has accomplished its purpose, be offered in evidence. But the weight of authority seems to incline the other way. Not that the pur-

pose was to hold that such memoranda would be admissible as original evidence, independent of the testimony of the witness, but are admitted upon the principle stated in Aetna Insurance Co. v Weide, 9 Wall., 677; Missouri Pacific Ry. Co. v. Johnson, 7 S. W. Rep., 839; Anchor Milling Co. v. Walsh, 18 S. W. Rep., 905; Chicago & N. W. Ry. Co. v. Ingersoll, 65 Ill., 404; Donovan v Boston & M. Ry. Co., 158 Mass., 450; Owens v. State, 10 Atl. Rep., 211, and Adams v. Coulliard, 102 Mass., 173.

In Aetna Insurance Co. v. Weide, supra, it is said: "In Merrill v. Ithaca & O. R. R. Co., 16 Wend., 586, it was held that when original entries are produced, and the person who made them and knew them at the time to be true, testified he made the entries, and that he believed them to be true, although at the time of testifying he had no recollection of the facts set forth in the entries, such evidence is admissible as prima facie evidence for the jury. In this case Mr. Justice Cowen, who delivered the opinion of the court, examined most of the authorities, English and American, on the subject. The same doctrine is also sustained by the case of Guy v Mead, 22 N. Y., 465, 466."

In Donovan v. Railroad Co., supra, train sheets were offered in evidence, and upon objection to their admissibility, the court said:

"If the sheet had been used and kept in the course of business by a third person, and not by the party by whom it was offered, there is authority in the decisions of this court for its competency. In Briggs v. Rafferty, 14 Gray, 525, after evidence that the plaintiff's clerk had marked packages of goods and sent them to be carried by rail to the defendant's place of residence, a servant of the railway corporation produced its regular freight business books, kept by himself, and testified that while he had no personal recollection of the facts, he had no doubt the entries in them were correct, and that the transactions therein recorded took place, and the evidence was held competent to prove the delivery of the goods at their place of destination. As the corporation received the goods in Boston and delivered them in Lawrence, and no other witnesses than the bookkeeper appeared in support of the entries, and as it is apparent that they could not have all have been made upon the personal knowledge of the bookkeeper, the evidence was held competent upon no better footing than the train sheet in the present case, except that the latter was made by a servant of the party in whose favor it was offered, and is thus evidence which it has made for itself. In Adams v. Coulliard, 102 Mass., 167, 173, entries from railway freight books were held to have properly been read to the jury, although it does not appear that the persons who made out the way-bills from which some of the entries were made, were called as witnesses, the court saying that 'inferences of fact are always to be legitimately drawn from the known course of business.' In these two cases the entries were declarations which tended directly to support the right of the carrier to claim compensation for a service, and one purpose of making them was to preserve evidence in support of a claim. In Townsend v. Pepperell, 99 Mass., 40, 43, 46, the account of the medical history of the case of a patient in the Massachusetts General Hospital was held competent evi-

dence when produced by the superintending physician, although he testified that he did not know by whom the entries were made, and that the book in which the account was entered was one of a series in his custody, in which, in the regular course of the business of the hospital, it was the duty of the physicians to enter the history of the cases under their charge; and in Costello v. Crowell, 133 Mass., 352, 355, a book entry, identified by the testimony of the bookkeeper who made it, was held competent to prove a date, although it does not appear that the fact stated in the entry was within his personal knowledge, and no other witness was called in support of it. In our opinion, because there is no reasonable possibility that any designed untruth had part in placing upon the train sheet the statements of which it is the vehicle, and all known circumstances concerning it favor its accuracy, and because it was an act rather than a declaration, and was sufficiently identified as genuine, it was competent evidence without the production or proof of the death of the operator who sent the message; and its entries material to the issue were admissible and proper for the jury to consider, notwithstanding the fact that it was made by the servants of the party by whom it was offered."

In Anchor Milling Co. v Walsh, supra, in passing upon the admissibility of the entries used as a memoranda, the court stated: "Since a party may testify in his own favor, it must be conceded that he, as well as his clerk or bookkeeper, may refresh his memory from entries made by him or under his eye, and then testify as to the fact with his memory thus refreshed. Now, in cases of an account composed of many items, all this means nothing more than reading the book in evidence. This we all know from daily experience in the trial courts. It is out of all reason to say that a merchant or his clerk can recall each item of the account, and a fair-minded witness will generally decline the attempt. Account books are admitted in evidence for the person by whom they are kept when the entries are made at the time or nearly so, of doing the principal fact, because entries made under such circumstances constitute a part of the *res gestae*. An entry thus made is more than a mere declaration of the party. It is a verbal act following the principal fact in the orderly conduct of business. Such is certainly the custom and course of business at the present day. We therefore conclude that an account books of original entries, fair on its face, and shown to have been kept in the usual course of business, is evidence even in favor of the party by whom it is kept. It follows that the shipping book should have been received in evidence."

There can be no difficulty about the evidence of the witness Stewart, and of the exhibits which are copies of entries made in the books that he kept. The entries were clearly admissible, and if Stewart was unble to recollect the facts, he could refresh his memory by the entries made by him. The witness Overstreet, while he furnished some of the data upon which the entries were made, was not the party making them, and only knows of their correctness by reason of the fact that Stewart correctly kept his books. As illustrated by the authorities cited, the fact that the entries were made by some one else would not deprive Overstreet of the right to use them for the purpose of refreshing his recollection, provided the entries were correctly made.

We have examined the questions presented in the remaining assignments, and find no reversible error except as pointed out in the charge of the court.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*